In the United States District Court
District of South Carolina
Greenville Division

| | |
|---|---|
| Jacqueline Massey-Hughes,<br><br>                    Plaintiff,<br>     v.<br><br>Broad River Furniture, Inc., Hillsboro Retail Group, Inc., and Ish Moore, Inc. all of which collectively are d/b/a Ishee, Broad River Retail, Ashley HomeStore, and Ashley Furniture HomeStore,<br><br>                    Defendants. | Complaint<br><br>Jury Trial Demanded |

Plaintiff, through her attorney, would respectfully show as follows:

1.     Plaintiff is a resident of Florida.

2.     Defendant Broad River Furniture, Inc. is a North Carolina corporation with a principal place of business in Fort Mill, South Carolina.

3.     Defendant Hillsboro Retail Group, Inc. is a South Carolina corporation with an apparent principal place of business in Fort Mill, South Carolina.

4.     Defendant Ish Moore, Inc. is a North Carolina corporation with a principal place of business in Fort Mill, South Carolina.

5.     Defendants have operated and done business with various trade names and as Ashley HomeStore and Ashley Furniture HomeStore as they collectively or individually are or operate as a licensee/franchisee of Ashley Furniture.

6.     Defendants advertise their integrated nature, using trade names like Broad River Retail, and touting that, "The Company currently employs over 500

1

associates, including over 350 in the stores." http://broadriverretail.com/who-we-are/. Defendants collectively refer to themselves as, "The largest and fastest-growing Ashley HomeStore Licensee in the Carolinas and Georgia." *Id.* Defendants are commonly managed, operate and market through one or more integrate web sites, and transfer assets and personnel between various affiliates, are commonly financed, operate for a single purpose, and provide common benefits.

7. Plaintiff was hired by Defendants in 2014 as a regional manager.

8. Plaintiff's region included Greenville, South Carolina. Plaintiff lived and worked for Defendants in Greenville, South Carolina.

9. Plaintiff performed well and received repeated praise for her performance as regional manager.

10. In May, 2015, the vice president of sales promoted Plaintiff to regional sales director for the South region.

11. Plaintiff's region continued to perform very well.

12. In or around June, 2016, the vice president resigned.

13. Plaintiff inquired about the vice president position. Defendants informed Plaintiff that she did not have the "pedigree" for a vice president level position, and that the company was looking for a candidate with experience in managing more than twenty locations.

14. Defendants appointed Todd Jones, a younger male, who did not have the "pedigree" Defendants claim they were looking for and whose performance was markedly worse than Plaintiff's.

15. Jones became Plaintiff's supervisor, and immediately began taking steps to replace her with a male.

16. In the third quarter of 2015, Plaintiff's region again performed well. In year over year growth in revenue, Plaintiff's region performed the best. Defendants, however, decided to hire a fourth regional director to fill a position that did not exist. Defendants hired a younger male and gave him two of Plaintiff's stores, including a very high performing store in Augusta, Georgia. Defendants told Plaintiff that they needed to make this move in order to hire the younger male.

17. Defendants imposed higher budgetary increases on Plaintiff's region than they imposed on the regions run by the men. Defendants also have focused marketing dollars on the regions operated by the men and neglected Plaintiff's region during the time she was running it.

18. In early February, Defendants put Plaintiff on a performance improvement plan. Defendants' purported area of concern was "metric performance." Specifically, Defendants cited two metrics: "Revenue to budget," and "SPG," which stands for "sales per guest." In the body of the PIP, they also establish a third metric goal for selling "Ashley Assurance."

19. Revenue to budget is a measure of how much revenue the stores in a region generate as opposed to a budgetary figure management imposes. In other words, it does not measure actual improvement, but rather, is a percentage of a subjective goal that, as noted above, was imposed in a discriminatory fashion. By way of example, for January 2016, the budgeted increase for Plaintiff's region was more than twice the budgeted increases for the highest male-run region. Defendants also

imposed on Plaintiff a higher budgeted amount for February and March than it imposed on any of the younger males, a whopping 56% and 54% respectively.

20. In addition to inflating the budget, revenue to budget is manipulated by marketing dollars. Defendants also track customer traffic, which is viewed as a measure of the marketing function and not operations. Plaintiff is aware, for example, that Defendants did not rent billboards for one or more stores that were rented when those stores were assigned male regional managers.

21. SPG is a measure of how much a store sells to each person who purchases items.

22. As to the first metric – revenue per budget -- despite setting the bar higher for Plaintiff than it did for the younger males, Defendants imposed a requirement on Plaintiff that she achieve 100% of the goal for revenue to budget during the PIP period, which was from February 4 – April 4, 2016. None of the younger males had achieved that goal even though their bars were set lower, and apparently none were placed on a PIP.

23. As to the second metric – SPG – Defendants imposed a requirement that Plaintiff's region obtain a score of 300. None of the males had achieved that goal for both of the periods measured. In fact, only one of them had achieved it for one of the periods. None were apparently put on a PIP, or required to achieve such a goal.

24. As to actual performance, Plaintiff's region had actually performed well compared to the other regions. For example, in the month leading up to the PIP (January 2016), company performance year-to-year was down overall. Plaintiff's region, however, had the least amount of decline of any of the regions. By comparison

Jones' region was, by far, the worst. Company revenue performance was down over 11%. Plaintiff's region was down only 1.6%. The next best region was the one containing the two stores taken from Plaintiff. Every other region was well into double digit declines. However, they were all run by younger men and no PIP was imposed on them.

25.     The PIP stated that Jones would meet with Plaintiff and review progress, which he failed to do. Plaintiff submitted the items requested of her and sought to review her improved performance with Jones, who largely ignored and dismissed her.

26.     Despite being treated in a disparate and disadvantaged manner, Plaintiff's region nonetheless demonstrated improvement and performance that exceeded that of the younger male managers.

27.     For example, as to sales revenues, during February and March, Plaintiff's region had the second highest increase in year-to-year revenue growth.

28.     Likewise, as to SPG, Plaintiff's region finished second in the company during March – only three points behind the region that was comprised of stores taken from her just months earlier.

29.     Jones' scores in both revenue to budget and SPG – the two metrics cited for Plaintiff's PIP – not only were worse than Plaintiff's, but they were worse for fiscal March (rev to budget) and the first quarter (SPG) than Plaintiff's scores were when she was placed on PIP. Yet, Jones was not held to the same level of performance as Plaintiff. Rather, he has had the "interim" tag removed and was promoted to vice president despite having the worst performance and not having the "pedigree" that purportedly kept Plaintiff from being appointed.

30. Defendants also froze Plaintiff out of communications and meetings and fostered rumors of her demise. Plaintiff complained to management about the disparate treatment and the refusal of Defendants to follow the PIP.

31. The improved performance of Plaintiff's region during the PIP period was recognized by the Company at a meeting held by Defendants in March, 2016. Ashley Furniture itself recognized the performance. Two of Plaintiff's four stores received coveted and prestigious "four star" recognition from Ashley Furniture.

32. When Plaintiff spoke to Jones at the end of March, 2016 about the fact that her numbers had improved, Jones told Plaintiff that the company was looking for improvement over a longer period of time. That statement obviously was a pretext because the clear terms of the PIP itself set a sixty-day period for review.

33. Moreover, despite the improvement in the numbers for Plaintiff's region, Defendants did not give Plaintiff more time to show further continued improvement. Rather, to stem the flow of positive performance numbers, Defendants summarily terminated Plaintiff's employment before the conclusion of the PIP period. The PIP does state that employment might be terminated prior to end of the sixty-day period. However, that would occur "if there is no significant improvement to indicate that the expectations and goals will be met within the timeline indicated in this PIP." Defendants acknowledged to Plaintiff that there was significant improvement, which is demonstrable. In addition, Jones stated that Defendants wanted to see a longer period of improvement so terminating the PIP early made no sense from a performance standpoint, especially since Plaintiff's performance far eclipsed that of Jones himself. Finally, while it is reasonable to conclude that Plaintiff would not have met 100% of her

revenue-to-budget goal, none of the younger males were expected to do so -- even though their bars were set lower. Likewise, Plaintiff's SPG numbers exceeded two of the younger male managers, and none of the other managers were held to a goal of 300. In fact, a document given to Plaintiff at termination showed her goal was actually 270, which she easily cleared and, in fact, she exceeded 300 on a number of occasions.

  34. Defendants gave Plaintiff two reasons for termination, each of which is pretextual. To justify their reasons, Defendants used partial numbers for the PIP period. Nonetheless, even the curated numbers Defendants cited show disparate treatment and retaliatory intent.

   a. Defendants acknowledged that Plaintiff exceeded her goal for SPG, which is the clearest metric for actual performance that cannot be neither manipulated with bogus budgetary projections nor diluted by poor marketing efforts over which operations managers have no control.

   b. Defendants cited the manipulated revenue per budget metric, despite the fact that Plaintiff's actual revenue performance exceeded all but one other manager and that younger males were not held to (nor likely met) the same standard as that imposed on Plaintiff.

   c. Defendants cited Plaintiff's purported failure to meet a goal of 6% for selling "Ashley Assurance" to customers. Plaintiff's score was 5.98 – a mere .02 from the goal. For fiscal March, Plaintiff exceeded the goal with a 6.11% and was second in the company.

Younger males were not required to meet 6% to keep their jobs. In fiscal March, for example, two of them did not. And once again, Jones' performance was the worst.

35. After Plaintiff was terminated, Defendants did not replace her. Instead, they assigned Plaintiff's stores to the younger male hired in 2015, who was given only part of a region for the time being in a transparent plan to replace Plaintiff.

36. The standards to which only Plaintiff was held also were not imposed on the younger males after Defendants terminated Plaintiff's employment. Younger males now make up the entirety of the regional sales management force.

37. Moreover, Plaintiff is aware that Defendants took extra steps to improve store performance after her termination, such as increasing marketing efforts withheld during Plaintiff's tenure, as well as a full store "refresh."

38. Plaintiff was the only female regional sales manager. The lack of females in management, however, permeated the company, especially in operations. At the sixteen total locations, only three were managed by women as of March 31, 2016. Defendants' hostility towards women and, in particular, women who complain about disparate treatment was not limited to Plaintiff. Defendants have displayed a pattern of discrimination against women in management and those who complain about it.

39. Prior to commencing this action, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission and she commences with action within 90 days of her receipt of a notice of right to sue.

40. Defendants' actions were willful and intentional and they discriminated and retaliated against Plaintiff in willful disregard of her rights under the law.

## Count I
## For a First Cause of Action
## Sex Discrimination – Title VII

41.  Plaintiff incorporates by reference the foregoing allegations as if set forth here in full.

42.  Defendants discriminated against Plaintiff and terminated her employment on the basis of her sex and/or sex plus age.

WHEREFORE, Plaintiff seeks a trial by jury on her claim of unlawful discrimination and entry of judgment and all other available legal and equitable relief, including reinstatement, actual damages to include lost wages and benefits, compensatory damages, punitive damages, attorney fees, costs, pre- and post-judgment interest.

## Count II
## For a Second Cause of Action
## Retaliation – Title VII

43.  Plaintiff incorporates by reference the foregoing allegations as if set forth here in full.

44.  Defendants retaliated and terminated Plaintiff promptly after she complained of the disparate treatment she received from Defendants thereby terminating her for her opposition to Defendants' unlawful practices and her participation in Defendants' internal processes.

WHEREFORE, Plaintiff seeks a trial by jury on her claim of retaliation and entry of judgment and all other available legal and equitable relief, including reinstatement, actual damages to include lost wages and benefits, compensatory damages, punitive damages, attorney fees, costs, pre- and post-judgment interest.

## Count III
## For a Third Cause of Action
## Age Discrimination – ADEA

45. Plaintiff incorporates by reference the foregoing allegations as if set forth here in full.

46. Defendants discriminated against Plaintiff and terminated her employment on the basis of her age.

WHEREFORE, Plaintiff seeks a trial by jury on her claim of unlawful discrimination and entry of judgment and all other available legal and equitable relief, including reinstatement, actual damages to include lost wages and benefits, liquidated damages, attorney fees, costs, pre- and post-judgment interest.

## Count IV
## For a Fourth Cause of Action
## Retaliation – ADEA

47. Plaintiff incorporates by reference the foregoing allegations as if set forth here in full.

48. Defendants retaliated and terminated Plaintiff promptly after she complained of the disparate treatment she received from Defendants thereby terminating her for her opposition to Defendants' unlawful practices and her participation in Defendants' internal processes.

WHEREFORE, Plaintiff seeks a trial by jury on her claim of retaliation and entry of judgment and all other available legal and equitable relief, including reinstatement, actual damages to include lost wages and benefits, liquidated damages, attorney fees, costs, pre- and post-judgment interest.

Respectfully submitted this 26th day of December, 2017.

                                              _s/ Brian P. Murphy_____
                                              Brian P. Murphy, Bar No. 6770
                                              Attorney for Plaintiff

Stephenson & Murphy, LLC
207 Whitsett Street
Greenville, SC 29601
Phone: (864) 370-9400
Fax:   (864) 240-9292